## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

EVETTE BETTY OSUEGBU,

     Defendant.

Case No. 3:23-CR-30138-NJR

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

After a six-day jury trial, Defendant Evette Betty Osuegbu was convicted of Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349, two counts of Mail Fraud in violation of 18 U.S.C. § 1341, ten counts of Wire Fraud in violation of 18 U.S.C. § 1343, Conspiracy to Commit Arson in violation of 18 U.S.C. § 844(i), and Use of Fire to Commit a Federal Felony in violation of 18 U.S.C. § 844(h)(1). (Docs. 135; 162). At the close of the Government's case, Osuegbu orally raised a Motion for Judgment of Acquittal, which she renewed at the close of all evidence. (Doc. 206, pp. 102, 115-116). The Court took the motion under advisement allowing the jury to deliberate and return its verdict.

Osuegbu now moves for judgment of acquittal notwithstanding the guilty verdict and, in the alternative, a new trial. She submitted a written brief in support of each motion (Docs. 171; 172), to which the Government responded in opposition (Docs. 177; 178).

### EVIDENCE PRESENTED AT TRIAL

The Government presented evidence related to three fires and a scheme to set a fourth. Trial commenced with expert testimony from Randy Schield, a credentialed fire investigator of 28 years with extensive experience working in the insurance industry. (Doc. 203, pp. 9-10). He generally described the method and approach for conducting structure fire investigations to determine a fire's origin and cause. (*Id.* at pp. 18-20). Schield investigated a fire that occurred on December 1, 2014, at 1711 Gaty Avenue, East St. Louis, Illinois ("the Gaty house"). (*Id.* at p. 21). He reviewed the East St. Louis fire department's report, conducted interviews, took photographs of the damage, and collected samples for testing from the property. (*Id.* at pp. 21-22).

During his investigation, Schield observed only two walls still standing, two City of East St. Louis contractors on the property burning debris and furniture in a barrel, no metal furnace or water heater remnants, removed electric circuits, damage to the vehicle in the driveway, warped vinyl siding on a neighboring house, an intact shed behind the structure, and an abnormal burn direction inside the home—burning down at the floor level. (*Id.* at pp. 24-32, 38-40). After testing the samples he collected from the home, no accelerants were detected. (*Id.* at pp. 34-35). Schield identified the origin of the fire as the center of the building in a bedroom area at floor level but could not determine the cause at that time. (*Id.* at pp. 39-40). He indicated that the damage and burn patterns at the scene could be explained by the use of Everclear as an ignitable liquid to start the fire. (*Id.* at pp. 41-42). On cross examination, Schield stated it was possible that the appliances and wiring could have been stolen from the home after the fire. (*Id.* at pp. 44-45).

Schield tried to speak with the property's owner, Roderick Tompkins, but was directed to meet with Tompkins's wife, "Betty Alla." (*Id.* at pp. 22-23, 35). A woman who identified herself as Betty arrived at the property during Schield's examination, and he interviewed her. (*Id.* at pp. 35-36). Betty indicated she lived at the property with Tompkins since October 2014. (*Id.* at p. 36). Betty told Schield that she went to the Casino Queen on the night of the fire to celebrate her birthday. (*Id.*). She left the residence around 9:30 p.m. and returned around midnight to get more money before leaving again. (*Id.* at pp. 36-37). Betty also reported that someone called Tompkins while they were at the Casino Queen and informed him about the fire. (*Id.* at pp. 37-38). Schield admitted that he could not remember what this woman looked like. (*Id.* at p. 37).

Another witness, Joseph Hathaway, testified as to the insurance on the Gaty house. Hathaway works as the president of the Illinois Fair Plan Association, a state organization designed to provide insurance to residents who could otherwise not obtain insurance. (*Id.* at pp. 47-48). He testified that Tompkins, as a homeowner, applied for insurance on the Gaty house. (*Id.* at pp. 50-51). His policy became effective on November 26, 2024, just five days before the fire at the Gaty house. (*Id.* at pp. 55, 58-59). An insurance claim was filed under Tompkins's policy on December 2, 2014. (*Id.* at pp. 48-49, 57-59). The sworn statement and proof of loss submitted with the claim reported an actual cash value of the property at the time of loss as $77,000, while the claim listed $119,000 in total loss. (*Id.* at pp. 62-63). A schedule of contents signed by Tompkins was submitted in connection with the claim that listed $39,574.70 in personal property lost or ruined in the Gaty house fire. (*Id.* at pp. 69-72).

The insurance application indicated that the purchase price of the property was $53,000. (*Id.* at pp. 51, 64). But the purchase contract for the Gaty house, dated October 22, 2014, showed a purchase price of $750, with an additional $100 in various fees. (*Id.* at pp. 63-64, 183-184). The contract listed Betty Jefferson—with an address of 2300 Clinton, Granite City, Illinois 62040—as the buyer. (*Id.* at pp. 64, 184-185). The property on Gaty was then signed over to Tompkins by Betty Jefferson, followed by a second signature of Evette Osuegbu.[1] (*Id.* at pp. 64-65). The name "Evette Osuegbu" is also written next to the notary paragraph. (*Id.* at p. 66). The property was deeded to Tompkins on January 7, 2015, after he applied for the insurance policy and after the fire. (*Id.* at p. 67).

Before its investigation of the claim, Illinois Fair Plan Association made a good faith initial payment on the claim of $2,500. (*Id.* at pp. 58-59). Eventually, Illinois Fair Plan Association denied the claim because the value of the property was materially misrepresented in the application and Tompkins had no insurable interest when he submitted the application, as the deed was not transferred to him until January 2015. (*Id.* at pp. 74-76). After receiving the denial, Osuegbu and Tompkins filed a lawsuit against Illinois Fair Plan Association that ultimately settled for $35,000. (*Id.* at pp. 78-83). In 2018, a check was cut to Osuegbu for $9,174.43 from the settlement, which she cashed at a First Bank branch in Granite City, Illinois.[2] (*Id.* at pp. 197-202). As to Osuegbu, her claims in

---

[1] The president of the company who conducted the auction and sold the Gaty house property, Whitney Strohmeyer, also testified and verified that Betty Jefferson purchased the property and called to request a name change form, which could be used to add another person to the deed. (Doc. 203, pp. 171-175, 184-194).
[2] The check was processed in Granite City, Illinois, then the transaction data went to a server in Missouri and Wisconsin, with the check image having passed through a server in Missouri then Arkansas. (Doc. 203, pp. 197-205).

the lawsuit arose from her personal property that was supposedly stored in the Gaty house at the time of the fire. (*Id.* at pp. 79, 85).

Tompkins further testified as to his role with Gaty and his relationship with Osuegbu.[3] First, Tompkins noted that he struggles to read and write but can sign his name. (*Id.* at pp. 94-95). Next, he stated that he met Osuegbu in 2014 when she approached him at the Casino Queen. (*Id.* at p. 95). At the time, Tompkins was homeless and considered Osuegbu someone with money who was kind to him. (*Id.* at pp. 95, 98, 104). Within a few days of meeting, Osuegbu invited Tompkins to her suite at the Casino Queen. (*Id.* at p. 97). From that point on, he stayed overnight at the casino on a fairly regular basis and considered Osuegbu his girlfriend. (*Id.* at pp. 99-100). Tompkins described an incident where he lost track of his jacket, wallet, and storage locker keys while staying in Osuegbu's room at the casino. (*Id.* at pp. 104-108, 110-112). On one occasion, he remembered Osuegbu inviting him to the St. Clair County courthouse for a housing auction. (*Id.* at pp. 100-102, 104). A couple days later, he went back to the courthouse with Osuegbu to sign papers, but he did not know what he signed. (*Id.* at pp. 103-104).

Later, Tompkins stated that Osuegbu "surprised" him with the Gaty house, and she wanted him to live there. (*Id.* at pp. 114-116). He did not like the neighborhood or the house, which he described as ramshackle with no furniture, electricity, or gas. (*Id.* at p. 116). Given its condition, Tompkins stated he would rather stay at the homeless shelter than at the

---

[3] Tompkins used the names "Evette" and "Betty," but ultimately identified Defendant Osuegbu as the woman to which he was referring. (Doc. 203, pp. 153-154).

Gaty house. (*Id.* at p. 117). But Osuegbu paid Tompkins's nephew, Antwan, to add electrical wiring to the house and hook up a furnace. (*Id.* at pp. 117-118; Doc. 204, pp. 8-10, 18, 21). She also gave money to Tompkins to pay his nephew for work done at the Gaty house. (Doc. 203, pp. 118, 122; Doc. 204, pp. 10-11). Tompkins reported going to the Gaty house about four or five times before the fire, but he never slept there. (Doc. 203, pp. 121-122). He was surprised to see furniture moved into the house on one visit, because the house needed to be cleaned first. (*Id.* at p. 122). Tompkins's nephew, Antwan, also testified that the house was not livable and smelled like trash. (Doc. 204, pp. 12-13). On the day of the Gaty house fire, Tompkins attended Osuegbu's birthday party at the Casino Queen. (Doc. 203, p. 126). A phone call from his brother awoke him from his sleep, and he learned the Gaty house had caught fire. (*Id.* at pp. 127-128). He told Osuegbu, who became hysterical, then called Osuegbu's daughter to help calm her and left the hotel. (*Id.* at pp. 128-129).

Tompkins did not recognize his signature on some of the insurance documents related to the Gaty house. (*Id.* at pp. 124-125). On the personal property inventory, he recognized his signature but declined ever sending the documents. (*Id.* at pp. 134-141). He denied seeing most of the listed property—including an expensive headboard, vacuum, portable fireplace, shoes, yard maintenance items, an entertainment system, a Christmas tree, a nativity set, and furniture—in the Gaty house before the fire, with the exception of many of Osuegbu's clothes.[4] (*Id.* at pp. 136-141). Though he apparently signed the advance

---

[4] Tompkins's nephew, Antwan, also described the furniture he saw in the Gaty house over the two and a half days he worked on electrical before the fire. (Doc. 204, pp. 13-17). Overall, he described the furniture as "horrible" and the place as "trashed." (*Id.* at pp. 17, 23). Antwan stated that the television in the living room was an older, bulky box-style model that did not work, and there was no entertainment center. (*Id.*

payment check, Tompkins never received any portion of the $2,500. (*Id.* at p. 141). Tompkins went with Osuegbu to a deposition to discuss the fire and, at Osuegbu's instruction, lied about her being out of town. (*Id.* at pp. 144-146).

In describing his relationship with Osuegbu, Tompkins asserted that they never had sexual relations. (*Id.* at p. 152). But he claimed that Osuegbu gave him a poster-sized picture of herself in a sheer negligee before the fire. (*Id.* at pp. 151-152). Osuegbu took the poster back and, a week later, Tompkins saw Osuegbu for the last time. (*Id.* at pp. 152-153). Tompkins also testified that he never gave Osuegbu authority to handle his financial affairs or file a lawsuit on his behalf. (*Id.* at pp. 168-170). On cross-examination, Tompkins admitted that there may be holes in his memory of events from ten years ago. (*Id.* at pp. 158, 159). He also stated that, at the time he knew Osuegbu, he was recently in recovery from a cocaine addiction. (*Id.* at pp. 166-167).

Rufis Jefferson ("Rufis"),[5] Osuegbu's nephew, admitted that he set the Gaty house fire. (Doc. 206, pp. 18, 23-25). According to Rufis, Osuegbu invented the plan to set fire to the Gaty house. (*Id.* at p. 25). The pair scouted potential homes through catalogs and by driving around neighborhoods. (*Id.* at pp. 25-26). Rufis testified that Osuegbu settled on the Gaty house because of the price, and he did not accompany her when she bought it. (*Id.* at p. 26). Rufis and Osuegbu went to Hudlin Insurance[6] in East St. Louis, Illinois, to obtain insurance on the Gaty house. (*Id.* at p. 27). Osuegbu gave Tompkins's wallet and ID to Rufis,

---

at pp. 15-16). In the bedroom, he denied seeing an expensive head and footboard, a television, or a laptop and printer. (*Id.* at pp. 16-17).

[5] For clarity, the Court will refer to Rufis Jefferson by his first name, as opposed to his last, because there are others involved with the same last name.

[6] Rufis originally said "Ledlin Insurance," but he agreed that "Hudlin" also made sense. (Doc. 206, p. 27).

so Rufis could impersonate Tompkins and sign his name on the insurance documents. (*Id.* at pp. 27-28, 45). Rufis practiced Tompkins's signature in the car before entering Hudlin. (*Id.* at p. 28). Leading up to the Gaty fire, Rufis met Tompkins several times, and Tompkins knew Rufis as his nickname "Cody." (Doc. 204, pp. 26, 97, 118-121; Doc. 206, p. 29; Doc. 213, p. 91). Rufis denied that Osuegbu and Tompkins were engaged in a romantic relationship, though he speculated that Tompkins probably thought so. (Doc. 206, pp. 29-30).

To prepare the Gaty house before the fire, Rufis fixed it up by running wires, putting furniture in the home, repairing the steps, adding locks to the back doors, and removing weeds from the yard. (*Id.* at pp. 30-31). He did so to make the Gaty house look livable before burning it down. (*Id.* at p. 31). Rufis said that Osuegbu paid one of Tompkins's relatives to help run electrical. (*Id.*). In the month that he worked on the Gaty house before the fire, Rufis testified that he stayed overnight pretty much every night, but Tompkins and Osuegbu never stayed the night. (*Id.* at pp. 31-32). Osuegbu and Rufis both referred to Tompkins as "Retarded Ricky." (*Id.* at pp. 32-33).

Osuegbu and Rufis created a plan for the night of the fire. (*Id.* at p. 33). The two decided that Osuegbu and Tompkins would be at the casino while Rufis set the fire. (*Id.*). Rufis's cousin and another nephew of Osuegbu's, Darrius Jefferson ("Darrius"),[7] dropped off Rufis to set the Gaty house fire. (Doc. 204, p. 98; Doc. 206, pp. 33-34; Doc. 213, pp. 90-91, 167). Darrius had several nicknames including Big Swin or Swindler, Ninny Cat, and Dirty.

---

[7] For clarity, the Court will refer to Darrius Jefferson by his first name, as opposed to his last, because there are others involved with the same last name.

(Doc. 204, p. 96; Doc. 213, pp. 91-92). Jasmine Macklin, the mother of four children with Darrius, was with him during the drop-off a street over from Gaty. (Doc. 204, pp. 96-99, 123; Doc. 206, pp. 33-34; Doc. 213, pp. 87, 167-168). Macklin and Darrius both testified that Osuegbu paid Darrius to drop off Rufis before the Gaty house fire. (Doc. 204, pp. 98-99; Doc. 213, p. 187).

To set the fire, Rufis brought Everclear and a spray bottle. (Doc. 206, p. 34). Rufis went around the Gaty house, through the alley, and into the back door. (*Id.* at p. 35). As the stove was the only source of heat for the home, it was turned on when Rufis entered. (*Id.*). He sprayed the Everclear around the stove and lit it. (*Id.*). Then, he sprayed the Everclear on the walls and the floor, saturating the foot of the bed in the bedroom and the walls connecting the bedroom and kitchen, which caused the fire to spread. (*Id.* at pp. 35-36). He left the property the same way he entered and met Darrius and Macklin who took him to 2300 Clinton Drive in Granite City, Illinois. (*Id.* at p. 36). When he arrived, he called Osuegbu letting her know it was done. (*Id.*).

According to Rufis, he received "gambling money" a couple months later for setting the Gaty house fire for Osuegbu. (*Id.* at p. 37). Rufis drove by the property after the fire to see his handiwork. (*Id.* at pp. 37-38). In reviewing the insurance inventory report, Rufis denied seeing any of the expensive items claimed in the Gaty house before the fire. (*Id.* at pp. 38-41). He also denied that the storage shed behind the Gaty house contained any item of value. (*Id.* at p. 40). Rufis testified that the Gaty house was not decorated for Christmas with a tree or nativity set. (*Id.* at p. 41). He explained that they filled the Gaty house with furniture from Goodwill or items that others were purging.

(*Id.*). Rufis stated that all the personal property in the Gaty house belonged to Osuegbu, but the inventory logs exaggerated the contents of the house and the worth of the items there. (*Id.* at p. 44). In 2018, after Osuegbu filed the lawsuit for the rejected insurance claim on the Gaty house, she brought Rufis to her lawyer's office, gave Rufis Tompkins's wallet and ID again, and asked him to sign the check as Tompkins. (*Id.* at pp. 45-49). Rufis did so. (*Id.*).

Moving to the next fire, Timothy Green, a Florissant police officer and certified fire investigator, testified that he went to the scene of a fire at 2245 Patterson Road, Florissant, Missouri ("the Patterson house") in December 2014. (Doc. 203, pp. 207-209). He took a series of 90 photos when he arrived at the scene of the fire at the Patterson house. (*Id.* at pp. 210-231). Green explained that the Patterson house showed no exterior damage and no damage other than soot in the living room. (*Id.* at pp. 211-213). He observed a Christmas tree with presents under it in the living room. (*Id.* at p. 230). Going through each of the three main-floor bedrooms, Green saw several mattresses, dressers, clothes hanging in the closets, clutter, and soot damage. (*Id.* at pp. 213-217). Green took photos of heat damage to the kitchen fan, noted that the oven range was turned off, and documented items left in the refrigerator. (*Id.* at pp. 217-218).

Down in the basement, Green pointed out the charred walls, the expansive soot and heat damage, and the melted smoke detector in the stairwell. (*Id.* at pp. 218-224). Plastic in the basement was melted, including wire on some Christmas lights and a CD and DVD holder. (*Id.* at pp. 228-229). An iron sat atop a bar in the basement, which appeared to be the point of origin for the fire. (*Id.* at pp. 225-226). The wire stemming

from the iron to a nearby outlet was entirely melted, along with the plug itself and surrounding outlet cover. (*Id.* at p. 227). Green seized the iron and presented it to the Florissant Police Department, who eventually turned it over to a private investigator. (*Id.* at p. 231).

Michael Limmer from Applied Computer Systems Investigative Services ("ACS") investigated the Patterson house fire as part of an insurance investigation and testified as an expert. (*Id.* at p. 244). During his inspection of the property, he also took a series of photos. (*Id.* at pp. 247-266). Limmer noted much of the same damage as Green, including smoke and soot damage upstairs, heavier smoke damage in the basement stairwell, a melted smoke detector, melted Christmas lights, damage to the bar and wall behind it, and an iron-shaped protected area on the bar. (*Id.* at pp. 249-263). He also looked for pour patterns of ignitable liquids but did not find any. (*Id.* at pp. 257-258). After examining the scene, Limmer went to the police station and photographed and analyzed the iron. (*Id.* at pp. 263-266). He explained the evidence of arc damage—a ball of copper that forms on the end of a wire that is plugged in—on the iron's cord. (*Id.* at pp. 264-266). The melted copper can serve as an ignition source. (*Id.* at p. 265). Originally, Limmer determined that the fire started at the bar in the basement from the iron power cord shorting and arcing closer to the plug end. (*Id.* at pp. 268-269). After hearing a hypothetical where an individual admitted to setting this fire with Everclear leaving the iron plugged in, Limmer changed his conclusion. (*Id.* at pp. 270-271). With this information, he would categorize the fire as intentionally set with the use of an ignitable liquid. (*Id.*).

Limmer identified Patricia Richmond as the tenant with the rental insurance policy

at the Patterson house. (*Id.* at p. 246). He interviewed Richmond as part of his investigation. (*Id.* at pp. 246, 266-268). Richmond moved into the Patterson house a month before the fire in mid-November 2014. (*Id.* at p. 246). On the day of the fire, she told Limmer that she and her two teenage daughters spent the night at a hotel in downtown St. Louis for the younger daughter's birthday. (*Id.* at pp. 246, 267). Richmond claimed that she returned to the home that night to grab some clothes, which she ironed. (*Id.* at p. 267). She apparently learned of the fire the following morning when they returned to the home. (*Id.*).

In 2014, Richmond worked as a dealer at Casino Queen. (Doc. 204, pp. 25-26; Doc. 206, pp. 49-50). At that time, she met Rufis, and they started dating.[8] (Doc. 204, pp. 26-27; Doc. 206, pp. 49-50). Richmond also knew Rufis's aunt, Osuegbu. (Doc. 204, p. 26; Doc. 206, pp. 49-50). Richmond applied to rent the Patterson house in November 2014 and also purchased rental insurance. (Doc. 204, pp. 29-33, 140-143). Rufis asked her about the renter's insurance policy and urged her to up the coverage to $100,000. (*Id.* at pp. 34-35, 79, 140, 143; Doc. 206, pp. 53-54). Eventually, Rufis revealed a plan that he claimed to have devised with his aunt, Osuegbu, to set the place on fire, collect insurance money, and split the proceeds. (Doc. 204, pp. 35-36, 79-80; Doc. 206, p. 51). Rufis knew, through Osuegbu, that Richmond was a single mother struggling financially. (Doc. 206, pp. 51-52). After some convincing, Richmond reluctantly, and regrettably, went along with the plan. (Doc. 204, pp. 36-38; Doc. 206, pp. 52-53). Darrius and Macklin lived in the

---

[8] At this time, Rufis was also engaged to a woman named Eureka Hampton. (Doc. 206, pp. 50-51).

Patterson house basement for over a week and overheard conversations about the fire scheme as well. (Doc. 204, pp. 104-107, 117-118). Macklin testified that she overheard conversations between Osuegbu and Rufis, and then Rufis and Richmond, about the plan. (*Id.* at pp. 105-107).

A week before the fire, Rufis spoke with Richmond about moving furniture into the Patterson house, supposedly at the request of Osuegbu, to receive more insurance money. (*Id.* at pp. 38, 81; Doc. 206, pp. 54-55). Richmond testified that additional furniture was moved into the Patterson house a day before the fire. (Doc. 204, pp. 38-39). Rufis claimed that Darrius helped him move in Osuegbu's furniture. (Doc. 206, p. 54). Before the fire, Richmond filled four or five trash bags with items from the house to keep them safe, including her daughters' personal belongings. (Doc. 204, p. 44). She gave these items to Osuegbu, who transported the bags in her red Durango truck back to Rufis. (*Id.* at pp. 44, 86). On the day of the fire, Richmond was celebrating her daughter's birthday at a hotel, knowing Rufis's plan to set the fire. (*Id.* at pp. 41, 83-84; Doc. 206, p. 55). She received a call from police informing her about the fire, after which she returned to the Patterson house. (Doc. 204, p. 42). In anticipation of the fire, Rufis coached Richmond to lie to investigators and tell them that she had been ironing. (*Id.* at pp. 43, 84; Doc. 206, p. 55).

Rufis also admitted that he set the Patterson house fire. (Doc. 206, pp. 24, 51, 54). His cousin, Osuegbu's daughter, dropped him off near the Patterson house to set the fire. (*Id.* at p. 56). Rufis went through the back, and the Everclear and iron were already in the basement. (*Id.*). He plugged in the iron, waited for it to heat up, sprayed the Everclear on

the bar area and floor, and then lit the area. (*Id.* at pp. 56-57). He plugged in the iron to fool investigators, not to start the fire. (*Id.* at p. 58). Rufis watched the fire spread and vacated the premises. (*Id.* at p. 57). Within 15 minutes, his cousin returned to pick him up and take him home.

After the fire, upon Rufis's suggestion, Richmond used a public adjuster, Gateway Adjusters, to help claim the lost personal property with the insurance company. (Doc. 204, pp. 48-52, 144-145). In the insurance claim, Richmond listed many items of furniture damaged in the Patterson house fire—several items were Osuegbu's that were moved in shortly before the fire. (*Id.* at pp. 50-56). Rufis denied helping fill out the inventory report but stated that the whole point of the fire was the insurance claim. (Doc. 206, pp. 59-60). Richmond received payment for the claim. (Doc. 204, p. 56). Almost immediately after the fire, Richmond received several smaller checks for a few thousand dollars each. (*Id.* at pp. 58-59, 146-147). She gave Rufis the proceeds from several smaller checks, supposedly because Osuegbu kept asking for money until the large payout posted. (*Id.* at pp. 58-60). Rufis, however, denied getting these smaller checks. (Doc. 206, pp. 60-61). But once insurance fully processed the claim in mid-March 2015, Richmond received a payment of $28,000. (Doc. 204, pp. 60-61). She gave the cash to Rufis, who was supposed to pay Osuegbu her portion, but Rufis ran off with the money and Richmond never saw him again. (*Id.* at p. 61; Doc. 206, pp. 61-62).

Richmond discovered that Rufis never paid Osuegbu after she received an angry phone call from Osuegbu. (Doc. 204, pp. 61-62). According to Richmond, Osuegbu

threatened to "gut [her] up" with a knife.[9] (*Id.* at p. 63). Out of fear, Richmond promised to make it right and pay the money, about $10,000, back to Osuegbu. (*Id.* at pp. 63-64). Shortly after this call, Richmond moved to Las Vegas and actually drove to Las Vegas with Osuegbu, who went on to California for a job. (*Id.* at pp. 64-67, 86). Richmond worked two jobs and sent Osuegbu between $500 to $800 per week. (*Id.* at pp. 66-67). Using MoneyGram[10] at a Wal-Mart in Las Vegas, Richmond regularly sent money to Osuegbu. (*Id.* at p. 67). When transferring money, Richmond called and alerted Osuegbu, who then retrieved the money at a Wal-Mart in California. (*Id.* at pp. 67-68). Given the situation, Richmond began saving her MoneyGram receipts, which she eventually turned over to the investigators at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). (*Id.* at pp. 68-70). The receipts reflected that Richmond made payments from June to October 2015. (*Id.* at pp. 70-74). At that point, Richmond confirmed with Osuegbu that the debt was fully satisfied and immediately changed her phone number. (*Id.* at p. 74).

Eight years later, Osuegbu took out a renter's and personal articles insurance policy at her own residence at 11921 Bellefontaine Road in St. Louis, Missouri ("Spanish Lake townhome"). (*Id.* at pp. 148-149). Osuegbu began living at the Spanish Lake townhome in 2019. (*Id.* at pp. 181-182). But her renter's policy was effective for a year, starting on July 27, 2022. (*Id.* at p. 149). The personal articles policy taken out by Osuegbu

---

[9] Rufis also testified that he kept the money from Osuegbu, who become very angry and started threatening Richmond. (Doc. 206, pp. 61-64).

[10] A representative from MoneyGram, Aurelio Lopez Bonilla, confirmed that its data reflects several payments from Patricia Richmond at a Wal-Mart in Las Vegas, Nevada, to Betty or Evette Osuegbu at Wal-Mart locations in California. (Doc. 204, pp. 88-93). Richmond also effected one payment from Bridgeton, Missouri. (*Id.* at p. 91). Bonilla also explained that when a consumer enters information into their systems at Wal-Mart, the terminal transmits to MoneyGram servers in Minnesota. (*Id.* at pp. 93-94).

insured jewelry for an additional $19,900 and had an effective date range from October 2022 to October 2023. (*Id.* at pp. 164-165). Interestingly, Osuegbu took out the insurance policies after she started withholding rent for ongoing issues and faced possible eviction by the new management company. (*Id.* at pp. 185-186, 189-191). During the effective periods for both policies, on December 31, 2022, a fire occurred at the Spanish Lake townhome, and Osuegbu filed a claim for insurance. (*Id.* at pp. 150-151, 186-187).

Many buildings make up the Spanish Lake complex and each building contains eight units. (*Id.* at p. 178). In December 2022, Osuegbu's building had two occupied townhomes—hers and an adjacent unit with a shared wall inhabited by Ronnie Crawford and his young son. (*Id.* at pp. 178-180, 192-193, 199). Crawford arrived home the night of the fire, parked out front, and walked into his townhome. (*Id.* at pp. 195-197). He called emergency services after observing smoke and burning. (*Id.*). Crawford grabbed important items from his home but struggled to breathe because of the amount of smoke upstairs. (*Id.* at pp. 197-198). He was displaced after the fire and, with the help of the Red Cross, stayed in a hotel for three nights before returning to live in the damaged townhome for another two to three months. (*Id.* at pp. 200-201).

A fire investigator, Nicholas Smith, visited the Spanish Lake townhome about a week after the fire to investigate.[11] (Doc. 213, pp. 27-28). He interviewed Osuegbu as part of his investigation. (*Id.* at pp. 28-30). Osuegbu indicated that she left her home around 5:30 p.m. on the night of the fire, December 31, 2022, and did not return until January 3,

---

[11] Given his extensive background and experience, Smith was qualified to testify as an expert in fire origin and cause investigations. (Doc. 213, pp. 30-33).

2023, when she learned of the fire. (*Id.* at p. 30). She spent New Years Eve at the Ameristar Casino hotel. (*Id.*). Osuegbu mentioned to Smith that, as she prepared and packed earlier in the day, she used a clothes iron on either the bed or floor. (*Id.*). Along with speaking to Osuegbu, Smith also investigated the scene and catalogued his observations through photographs. (*Id.* at pp. 33-64). Smith did not observe fire damage in the living room or main level but did see smoke damage. (*Id.* at p. 39). He noticed that the oven was open, but not likely the source of the fire, though Osuegbu claimed to heat the unit with the oven because it was cheaper to do so. (*Id.* at pp. 41-42).

There was inexplicable fire damage from the top of the steps leading to the bed area, and all the fire damage was located at the foot of the bed and at the mattress. (*Id.* at pp. 42-44, 49-50, 63). Smith found a cord with evidence of electrical activity and a pattern that matched a clothes iron, which the fire department moved after the fire. (*Id.* at pp. 51, 53-55). The iron was set to "on" under the cotton setting and was energized and plugged in at the time of the fire. (*Id.* at pp. 53, 55-56). Smith tested carpet samples for ignitable liquid residue but did not find any traces. (*Id.* at pp. 61-62). He concluded the area at the foot of the bed and the bed itself was the point of origin of the fire. (*Id.* at pp. 47-48). As for cause, Smith determined that the iron itself caused the fire. (*Id.* at pp. 62-63). Given a hypothetical that someone sprayed Everclear grain alcohol on the carpet as an accelerant with the iron left behind as a ruse, Smith stated that would explain the irregular burning pattern from the top of the stairs towards the foot of the bed. (*Id.* at pp. 63-64).

Smith took the iron into evidence and turned it over to the ATF upon request. (*Id.* at p. 59). Cameron Novak, a senior electrical and fire protection engineer of the Fire

Research Laboratory within the ATF, was qualified as an expert during trial. (*Id.* at pp. 65-73). He analyzed the iron from the Spanish Lake townhome fire in his lab to look for evidence of failure. (*Id.* at pp. 73-74). Novak checked for signs of damage to the cord, arcing, and localized melting to the cord as indicators that the iron was energized (or plugged in) at the time of the fire. (*Id.* at pp. 73-75). He confirmed the iron was energized, it arced, it short circuited, and its conductors melted, but, otherwise, the iron was relatively undamaged. (*Id.* at pp. 76, 82-84). Internally, the iron's heating element remained intact along with the bi-metallic element, demonstrating that the heating elements did not fail. (*Id.* at pp. 77-82). Without heating element failure, clothing irons typically cannot produce enough heat to start a fire. (*Id.* at pp. 75-78, 82). Without evaluating the scene, Novak could not conclude that the arcing on the iron's cord caused the fire. (*Id.* at pp. 84-85).

Familiarly, Rufis admitted that he set the Spanish Lake townhome fire.[12] (Doc. 206, pp. 24, 64-65). Rufis stated that he and Osuegbu devised the plan when they were at risk of eviction.[13] (*Id.* at pp. 65-66). They formed the plan only a week before the fire occurred. (*Id.* at p. 66). The two prearranged to have Osuegbu stay at a casino the night that Rufis set the fire. (*Id.* at p. 67). Osuegbu left the back door unlocked for Rufis to enter. (*Id.*). Rufis drove himself to set this fire and parked next door. (*Id.* at p. 68). He entered through the back door as planned, went upstairs, plugged in the iron, waited for it to warm up, sprayed the Everclear, and lit it. (*Id.* at pp. 68-69). But the flame kept fizzling out, which

---

[12] Darrius testified that he knew Rufis set the Spanish Lake townhome fire as well. (Doc. 213, p. 96).
[13]  Rufus testified that he stayed at the townhome periodically, "maybe three or four times a week."

Rufis attributed to fireproof carpeting. (*Id.* at p. 69). He made more attempts to start the fire, and he sprayed more Everclear on the bed, footboard, and mattress. (*Id.*). The fire did not start like normal, but Rufis left because the fire alarm and smoke detectors started sounding. (*Id.*). He called Osuegbu to report that he could not get the fire to spread. (*Id.*). But Rufis later discovered that the fire did catch when he drove by the following morning. (*Id.* at pp. 69-70). Again, he called Osuegbu to inform her the plan worked. (*Id.* at p. 70). After the fire, Rufis went to the Red Cross for temporary assistance and received several hundred dollars, which he paid to Osuegbu. (*Id.* at pp. 70-71).

As a result of the Spanish Lake townhome fire, Osuegbu received $30,180 for personal property, $7,049.73 for additional living expenses/temporary housing, and $19,978 for personal articles.[14] (Doc. 204, pp. 152, 156-157, 167). As for temporary housing, Osuegbu stayed in a Residence Inn by Marriot hotel for two months through February 2023. (*Id.* at pp. 158, 205). While at the hotel, Osuegbu used a scanner in the office area to send scanned faxes, including an insurance declaration page. (*Id.* at pp. 204-205). A lead infrastructure engineer at State Farm, who monitors and maintains its e-mail service, verified that an email was sent to statefarmfireclaims@statefarm.com from

---

[14] A company called Fiserv, a multinational processor of financial transactions, sends payments on behalf of State Farm that travel across its servers in Chandler, Arizona, and Omaha, Nebraska. (Doc. 213, pp. 14-15). State Farm Fire has a bank account with Pathward Bank located in Sioux Falls, South Dakota. (*Id.* at p. 16). Pathward transmits to Visa (for debit cards) which would transmit to the bank account of the insurance payment recipient. (*Id.* at pp. 17-18). Fiserv has record of four payments on January 7, 2023, January 19, 2023, January 20, 2023, and February 9, 2023, from State Farm Fire to a recipient with a first name beginning with E and last name ending in U with an email address starting with B.O and ending with student.swic.edu. (*Id.* at p. 17). The payment amounts were $1,000, $19,978, $15,590, and $13,590. (*Id.*). Osuegbu deposited these payments into her checking account at U.S. Bank and later withdrew the funds. (*Id.* at pp. 19- 25). U.S. Bank hosts its servers in Chaska, Minnesota, where these deposits would have been logged. (*Id.* at pp. 20, 22-23).

scan@marriott.com on January 18, 2023, containing an attached Property Loss Advance Notice signed by Evette Osuegbu. (Doc. 203, pp. 88-91; Doc. 204, pp. 209-210).[15] Osuegbu also exchanged emails with State Farm related to the Spanish Lake townhome fire.[16]

Jennifer Gruenenfelder, the Director of Sales at the Residence Inn in early 2023, testified that the hotel informed Osuegbu that her insurance provider stopped paying for her stay so she either had to leave or pay herself, which irritated Osuegbu. (Doc. 204, pp. 206-207). Gruenenfelder assumed Osuegbu had departed when she left the hotel for most of the day, so the hotel disabled her key, but then Osuegbu returned to retrieve her belongings. (*Id*. at pp. 207-208). Hotel staff had already cleared out the room, gathered Osuegbu's belongings, and placed them in a bag in the office area. (*Id*. at p. 208). Later, Osuegbu accused the hotel of throwing out valuable items including expensive perfume, bars of gold, and jewelry. (*Id*. at pp. 208-209).

In February 2023, shortly after the fire at Osuegbu's Spanish Lake townhome, Darrius Jefferson contacted agents at the ATF. (Doc. 213, p. 92). At the time, he was living at 2300 Clinton Drive, Granite City, Illinois 62040 ("the Clinton house") with his wife, their seven children, and his wife's mother and grandmother.[17] (*Id*. at pp. 92-93, 102; Doc. 204, pp. 214-215). Apparently, Darrius feared that Osuegbu would burn down the

---

[15] He testified that State Farm's email servers are located in Richardson, Texas, and Olathe, Kansas, and any email sent to statefarmfireclaims@statefarm.com is housed on those two servers. (Doc. 203, pp. 87-91).

[16] A law enforcement response specialist for Microsoft, Sylvia Matias, testified that two emails from B.OSUEGBU@STUDENT.SWIC.EDU were sent to statefarmfireclaims@statefarm.com traveling through servers in Chicago, Illinois, on January 28, 2023. (Doc. 213, pp. 10-11). A loss report was attached to one email, and an image was attached to the other. (*Id*. at pp. 11-12).

[17] Osuegbu acted as the president of Alwayz Kare, and she owned the Clinton house. (Doc. 213, pp. 90, 101-103). Osuegbu's Spanish Lake townhome was listed as the business address for Alwayz Kare. (*Id*. at p. 101). Osuegbu was Darrius's landlord. (*Id*. at p. 115). Alwayz Kare was listed on the insurance policy that Darrius later acquired. (Doc. 206, pp. 5-6).

Clinton house because a month earlier she raised the idea.[18] (Doc. 213, pp. 95, 103-104). Among his reasons for reaching out to the ATF, Darrius worried that he would not be able to safely evacuate everyone if the Clinton house caught fire. (*Id.* at p. 104). Darrius learned about the plot to burn the Clinton house when he heard the payout was not proceeding as planned after the fire at the Spanish Lake townhome. (*Id.* at pp. 165-167). Eventually, Darrius agreed to record some of his telephonic and in-person contacts with Osuegbu, Rufis, and an insurance representative to assist with the ATF's investigation. (*Id.* at pp. 104-105).

Darrius took out a renter's insurance policy through Country Financial for the Clinton house.[19] (Doc. 204, pp. 214-215; Doc. 206, pp. 5-12). The policy became effective on January 23, 2023, with policy limits of $300,000 for liability, $5,000 for medical payments per person up to $25,000 for each occurrence, and $20,000 for personal property coverage. (Doc. 204, p. 215). Rachael Beckemeyer, an insurance representative from Country Financial, testified that Darrius and Osuegbu came into the insurance office separately to sign for the policy, and Osuegbu paid for the policy. (Doc. 206, pp. 4-10). According to Darrius, he upset Osuegbu because he failed to request enough insurance

---

[18] Darrius understood that Rufis set the fires, but Osuegbu helped plan them and arrange insurance. (Doc. 213, pp. 96-97). Rufis testified as to the plan to burn the Clinton house for insurance money. (Doc. 206, pp. 73-74).

[19] Brett Reid, a supervisor at Country Financial who oversees a contract with Fiserv Output Solutions, testified regarding insurance policyholder mailings. (Doc. 204, pp. 212 213). Country Financial transfers secure data files to Fiserv, who then printed out all the policy documents—policies, invoices, cancellations, declarations, etc.—and mailed the documents from its facility in Stafford, Texas to Country Financial policyholders via the United States Postal Service. (*Id*. at pp. 213-214). Fiserv typically has 48 hours to send the documents from the date Country Financial sends the data. (*Id*. at p. 215).

coverage for personal property.[20] (Doc. 213, pp. 97, 99). About a month later, Darrius increased his personal property coverage in the policy to $50,000. (Doc. 204, pp. 216-217; Doc. 206, pp. 12-13; Doc. 213, pp. 109-110). When he made these changes to the policy, Darrius recorded two phone calls he had with Osuegbu discussing the insurance changes and one call with Beckemeyer. (Doc. 213, pp. 106-108). Osuegbu and Beckemeyer exchanged emails after Darrius requested to increase the policy's coverage.[21] (Doc. 206, pp. 11-13).

A few days later, Darrius recorded a phone call with Osuegbu, an in-person conversation with Osuegbu at the Clinton house, and a meeting with Osuegbu and Rufis at a Wal-Mart. (Doc. 213, pp. 111-112, 125-126). Darrius captured the in-person interaction with a camera, which provided audio and video recording. (*Id.* at pp. 111-112). Darrius inquired as to how long Osuegbu wanted to wait before having the Clinton house burned down. (*Id.* at pp. 113-114). Osuegbu suggested she would wait at least a month from the time the increased insurance policy took effect. (*Id.*). Osuegbu assured Darrius that Rufis could handle setting the fire, she counseled that the fire should be started from down low, and she warned about possible cameras at the neighboring school and a nearby house. (*Id.* at pp. 114-115, 123-125). Rufis confirmed that the neighbor across the street

---

[20] Rufis also testified that Osuegbu was frustrated because Darrius failed to get high enough coverage. (Doc. 206, p. 75).
[21] A law enforcement response specialist for Microsoft, Sylvia Matias, testified that an email from B.OSUEGBU@STUDENT.SWIC.EDU was sent to Rachael Beckemeyer at Country Financial traveling electronically through servers in Quincy, Washington, Chicago, Illinois, and Boydton, Virginia, on January 24, 2023. (Doc. 213, pp. 6-10). The email contained an attachment entitled 2300 Clinton.pdf., which was a declaration or certificate of insurance. (Doc. 206, pp. 10-11; Doc. 213, p. 10).

had cameras. (Doc. 206, pp. 74-75). He also explained the importance of setting a low fire because fire and smoke goes up, and smoke damage is necessary if the fire does not destroy the house. (*Id.* at pp. 75-76). On the recording, Osuegbu said that Easter may provide good timing because a fire could reasonably be explained by cooking or kids playing.

Two weeks later, Osuegbu and Darrius discussed insurance paperwork. (Doc. 213, pp. 126-127). Osuegbu explained how the claim would be paid and the availability of temporary lodging. She also said that May would be perfect, which Darrius understood as meaning a perfect time to set the fire. (*Id.* at pp. 128-129). Osuegbu mentioned her landlord's insurance. They also discussed changing the listed monthly rent to $1,800 or $2,000, to increase the loss-of-rent insurance paid out to Osuegbu, though Darrius actually paid $1,300. (*Id.* at pp. 129-130).

On April 7, 2023, Darrius met with Osuegbu, who read a text from State Farm explaining that she had been rejected for landlord insurance due to high risk. Rufis suggested adapting the plan to burn a property owned by Darrius's wife's grandmother at 633 Washington Street in Venice, Illinois ("the Washington house"). (*Id.* at pp. 134-139, 146-147-150; Doc. 206, pp. 76-77). Rufis and Osuegbu urged Darrius to transfer his renter's insurance policy to the Washington house, and Osuegbu proposed drafting a fake lease. (Doc. 213, p. 144). Osuegbu described the Washington house as a little wooden house, to which Rufis claimed it would "go up." Both Osuegbu and Jefferson told Darrius what to do as far as transferring the renter's policy, moving in furniture, and turning on the utilities. The recording captures Osuegbu telling Darrius to wait a couple weeks, then he

would be good. Rufis was recorded bragging about his fire-setting prowess but discussed the issues with the fire-resistant carpet at the Spanish Lake townhome. (*Id.* at p. 142). Rufis also reassured Darrius that the Washington house would burn easily.

Osuegbu delivered a fabricated lease to Darrius for the Washington house listing Darrius's mother-in-law as the landlord and Rufis as the tenant. (*Id.* at pp. 143-151). Rufis and Darrius met at the Washington house where Rufis signed the fake lease. (*Id.* at pp. 153-155; Doc. 206, pp. 77-79). Rufis was recorded describing the method he planned to use to set the Washington house on fire. He told Darrius to be on the hunt for an old iron. On one of the recordings, Osuegbu explained that Rufis used Everclear in a spray bottle and sprayed the furniture. Rufis and Osuegbu were arrested before the Washington house fire proceeded.

Osuegbu reported that her identity was stolen in June 2023. (Doc. 206, pp. 106-108). Darrius testified that his mother and Osuegbu's sister, Clarie Jefferson ("Clarie"),[22] applied for a state ID with her picture, but with Osuegbu's personal information. (Doc. 213, pp. 178-180). Investigator Brandon Reiher with the Illinois Secretary of State's office testified that he investigated Osuegbu's claim of stolen identity. (Doc. 206, pp. 106-108). He determined that Osuegbu was the victim of identity theft after a fraudulent driver's license was obtained with her information but with a photograph of Clarie Jefferson. (*Id.* at pp. 108-109). Clarie obtained the ID card, which was issued on May 31, 2023, to get a registration sticker. (*Id.* at p. 111). Osuegbu made a claim within two weeks.

---

[22] For clarity, the Court will refer to Clarie Jefferson by her first name, as opposed to her last, because there are others involved with the same last name.

(*Id.* at p. 112). Reiher did not find any evidence that the ID card was used during those two weeks for any purpose other than the registration sticker, but there was no way for him to definitively state what Clarie did with the ID. (*Id.*).

Of course, credibility remained a primary issue for the witnesses at trial. Starting with Macklin, she pleaded guilty to two federal felonies in 2018 for mail and wire fraud and making a false statement, and Darrius was her co-defendant to those charges. (Doc. 204, pp. 111-116). Macklin testified that she knew about the intent to burn the Gaty house and did not report it. (*Id.* at pp. 123-125). She also knew of the plans for the Patterson house fire and stayed in a hotel with proceeds from insurance, but failed to notify anyone after the fire, though she claims to have anonymously reported the fire to the ATF before it happened. (*Id.* at pp. 118-123).

Turning to Darrius, the ATF provided funds for him to relocate and move into a new place in June 2023, including the first and last months' rent, a holding fee, relocation expenses, and utilities. (Doc. 213, pp. 88-89, 152). The ATF also helped him pay rent at the Clinton house while he acted as a confidential informant. (*Id.* at pp. 130, 152). In total, Darrius received $10,800. (*Id.* at pp. 152-153). Darrius also has two felony convictions for false statement and mail fraud with Macklin. (*Id.* at p. 160). His criminal history is littered with drug convictions dating back to 2000, gun charges, multiple stints in federal prison totaling over 17 years, and a state conviction for forgery from 1995. (*Id.* at pp. 161-163). At the time of trial, Darrius had only been out of prison for about four years. (*Id.* at p. 164). He testified that he had not held a job since being released from prison. (*Id.*). Similar to Macklin, Darrius testified that he knew that Rufis set the Gaty house and Patterson house

fires and did not report them at the time. (*Id.* at pp. 167-168, 183-184). He also took out the insurance policy at the Clinton house before he contacted the ATF and agreed to be a confidential informant. (*Id.* at pp. 169-171).

Moving to Rufis, Macklin and Darrius both testified that Rufis had a drinking problem. (*Id.* at p. 132; Doc. 204, p. 124). Osuegbu was also recorded warning Darrius of Rufis's drinking issues. Rufis himself admitted to being an active alcoholic before his incarceration, which affected his memory. (Doc. 206, pp. 17-18, 89). Darrius testified that Rufis bragged about being an arsonist, and Rufis was also recorded saying as much. (*Id.* at pp. 19-22; Doc. 213, pp. 183-184). Rufis, like Darrius, has an extensive criminal history with many state and federal felony convictions including robbery, possession of a controlled substance, aggravated battery, possession of a weapon by a felon, driving under the influence, resisting a peace officer, and murder. (Doc. 206, pp. 23, 87-88). He has spent over half of his adult life in prison. (*Id.* at p. 87). Rufis pleaded guilty to the charges against him in this case, admitted to starting several fires, and testified against Osuegbu hoping for leniency for his cooperation. (*Id.* at pp. 19-23, 89-92, 100). He admitted to lying to police and setting fires without informing the authorities. (*Id.* at pp. 95-98). And originally, in July 2023, Rufis told police that Osuegbu had nothing to do with the fires. (*Id.* at pp. 98-99).

### Legal Standards

#### I.  Motion for Judgment of Acquittal

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P.

29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the government, "no rational juror could find guilt beyond a reasonable doubt." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009); *see also United States v. Kelerchian,* 937 F.3d 895, 907 (7th Cir. 2019) ("We ask whether any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.") (internal citations and quotation marks omitted). The Seventh Circuit frequently characterizes the movant's hurdle under Rule 29 as "nearly insurmountable," but "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Price,* 28 F.4th 739, 752 (7th Cir. 2022); *Kelerchian*, 937 F.3d at 907.

Of course, jury verdicts are afforded great deference. *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019). The Court must remain mindful that the jury has the exclusive function of determining the credibility of witnesses, resolving evidentiary conflicts, and drawing reasonable inferences. *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989) (quoting *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986)). In other words, on a Rule 29 motion, a court should not "reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009).

## II.  Motion for New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). A new trial is

warranted only if "the evidence preponderates heavily against the verdict, such that it
would be a miscarriage of justice to let the verdict stand," *United States v. Swan*, 486 F.3d
260, 266 (7th Cir. 2007), or "if there is a reasonable possibility that [a] trial error had a
prejudicial effect on the jury's verdict." *United States v. Flournoy,* 842 F.3d 524, 530 (7th
Cir. 2016) (citing *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996)). Under Rule 33,
"[g]ranting a new trial in the interest of justice is reserved for only the most extreme
cases." *United States v. Coscia,* 4 F.4th 454, 465 (7th Cir. 2021) (internal quotation marks
omitted) (quoting *United States v. Hagler,* 700 F.3d 1091, 1101 (7th Cir. 2012)).

### III. Motion for Release Pending Sentencing

The release or detention of a defendant pending sentencing is governed by
18 U.S.C. § 3143. Typically, a person who has been found guilty of an offense and who is
awaiting imposition or execution of his or her sentence shall be ordered detained.
*See* 18 U.S.C. § 3143(a). But such person can be released pending sentencing if a judicial
officer makes the requisite findings. *Id.* Persons convicted of offenses listed in 18 U.S.C.
§ 2332b(g)(5)(B), for which a maximum term of imprisonment of ten years or more is
prescribed, *must* be detained unless:

> (A)    (i) the judicial officer finds there is a substantial likelihood that a
> motion for acquittal or new trial will be granted; or (ii) an attorney
> for the Government has recommended that no sentence of
> imprisonment be imposed on the person; *and*

> (B)    the judicial officer finds by clear and convincing evidence that the
> person is not likely to flee or pose a danger to the safety of any other
> person or the community.

18 U.S.C. § 3143(a)(2) (emphasis added).

D<span style="font-variant:small-caps">ISCUSSION</span>

Osuegbu avers that the Government presented insufficient evidence at trial to substantiate a guilty verdict on all 15 counts against her. She also moves for a new trial on three grounds: that the Court erred in its response to a jury question raised during deliberations, the Court erred in failing to grant the motion to strike the venire panel and declare a mistrial due to the lack of racial diversity on the panel, and that Osuegbu suffered prejudice by the denial of her pretrial request for release pending trial to present herself in the manner of her choosing to the jury. After these motions were filed, Osuegbu also moved for release from custody to get her affairs in order in advance of her sentencing. (Doc. 195).

### I. Motion for Judgment of Acquittal (Doc. 171)

In moving for judgment of acquittal notwithstanding the verdict, Osuegbu does not point to any specific deficiencies in the Government's evidence but generally criticizes the evidence adduced at trial as insufficient to support a guilty verdict on all 15 counts. (Doc. 171).

In response, the Government highlights the evidence produced at trial of fires set at the Gaty house, the Patterson house, and the Spanish Lake townhome, along with the plans to set fires at the Clinton and Washington houses. (Doc. 177). The Government also emphasizes evidence of insurance payouts and MoneyGram payments to Osuegbu after the fires, testimony of her co-conspirators, testimony of her romance scam victim, and recordings of Osuegbu discussing the plan to run another arson and insurance scheme. (*Id.*). The Government claims that this evidence substantiates Count 1 for conspiracy to

commit mail and wire fraud. (*Id.*). From there, the Government argues that the discreet counts for mail and wire fraud—Counts 2 to 13—were also overwhelmingly substantiated through the details presented at trial that Osuegbu caused fraudulent communications to be sent via the United States Postal Service and fraudulent electronic communications to be sent and travel interstate. (*Id.*).

As to Count 14 for conspiracy to commit arson, the Government asserts that it established Osuegbu knowingly conspired to coordinate the malicious damage and destruction of three rental properties including the Patterson house, the Spanish Lake townhome, and the Clinton house. (*Id.*). And, lastly, as to Count 15 for use of fire to commit a federal felony, the Government states that evidence adduced at trial showed Osuegbu used fire to commit wire fraud with the subsequent insurance claims on the burned properties and related communications. (*Id.*).

The Court thoroughly recounted the evidence presented at trial above. As to Count 1 for conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349, the Government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement. *United States v. Griffin*, 76 F.4th 724, 742 (7th Cir. 2023) (internal quotation marks omitted). Further, for a single, overarching conspiracy to exist, its participants must be aware of one another and must each do something in furtherance of the single, illegal enterprise. *Id.* (internal quotation marks omitted).

In this case, the Government specifically defined the conspiracy as an effort to maliciously damage and destroy by fire buildings in interstate commerce, namely the

rental properties at the Patterson house, the Spanish Lake townhome, and the Clinton house. The Government introduced abundant evidence that Osuegbu conspired with Rufis, Richmond, and Darrius to commit mail and wire fraud by planning the fires at the rental properties, taking out insurance policies on the affected properties, falsifying personal property inventories, and defrauding insurance companies to receive payouts after the fires. Her co-conspirators testified as to Osuegbu's role in the various arson and insurance schemes at each property. Osuegbu completed and submitted insurance paperwork tied to her via mail and email, and she was recorded discussing strategy for an upcoming fire at the Clinton house.

More specifically, Osuegbu moved her own furniture into the Patterson house, threatened Richmond, and received repeated MoneyGram payments from Richmond after the Patterson house fire because Rufis ran off with the insurance proceeds. She also personally took out the insurance policy for the Spanish Lake townhome and directly received payments after the fire there. As to the planning of the fire at the Clinton house (and then the Washington house), Osuegbu went in to sign for the insurance policy, she paid for the policy, she drafted and delivered a fabricated lease, and she advised Darrius about the best way to carry out the scheme, explaining the ideal timing and warning Darrius of potential cameras at neighboring houses. Moreover, the timing of each insurance policy in relation to the subsequent fire and the similar manner in which each arson and insurance collection was carried out also could convince a jury of Osuegbu's involvement in an overarching conspiracy. Sure, Rufis, Darrius, and Macklin posed credibility issues, but the jury weighed their credibility in rendering its decision, and the

Court is not permitted to reweigh it now.

To substantiate mail fraud (Counts 2 and 3), the Government had to show "(1) a scheme to defraud, (2) use of the mails, and (3) [the defendant's] participation in the scheme with the intent to defraud." *United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017). In particular, the Government identified the scheme to defraud involved an effort to obtain money and other compensation from insurance companies through the arson of residential properties at the Gaty house, the Patterson house, the Spanish Lake townhome, the Clinton house, and the Washington house. At trial, the Government introduced testimony, such as that from Brett Reid, and documentary evidence demonstrating that Fiserv sent two insurance policy declaration pages via United States mail to Osuegbu's property, the Clinton house. These communications were sent because Osuegbu purchased insurance, even though she displayed an intention of having her nephew set fire to the insured property.

Similarly, for wire fraud (Counts 4 to 13), the Government must demonstrate that Osuegbu "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Here, the Government specifically defined the scheme as an effort to obtain money and other compensation from insurance companies through the arson of residential properties at the Gaty house, the Patterson house, the Spanish Lake townhome, the Clinton house, and the Washington house. Osuegbu was charged with ten counts for specific instances of wire fraud from January 2023 to May 2023, including insurance payments sent to her bank account, email communications with fraudulent

insurance declarations, attestations, and inventory reports, payment rendered for insurance at the Clinton house, and text messages in furtherance of the Clinton house scheme.

A reasonable jury could easily find support for each of these communications in the record. As detailed above, the Government introduced exhibits containing many wire communications including email messages, texts, and payment records. In addition, several witnesses and technical employees from Microsoft, State Farm, Country Financial, and Fiserv testified as to the wire communications and the various server locations that payments and emails passed through. Testimony from Darrius, Gruenenfelder, Beckemeyer, and others tie Osuegbu to the various communications as well.

As to both the mail and wire fraud counts, the Government presented plentiful evidence of the overall scheme to defraud. For example, Osuegbu purchased the Gaty house, convinced Roderick Tompkins to take out insurance on the house before she even transferred the deed to him, paid Antwan Tompkins to run power to the home, had Rufis make the home appear livable, arranged for her furniture and belongings to be moved into the home, paid Darrius to drive Rufis to the house, initiated a lawsuit after the insurance claim was denied, and received a settlement payment as a result. According to the evidence presented at trial, with the Patterson home, Osuegbu urged Rufis to convince Richmond to take out a renter's insurance policy with a high limit for personal property and had her furniture moved into the home shortly before the fire. She also scared and threatened Richmond into paying back the insurance money with which Rufis

absconded.

Years later, Osuegbu took out an insurance policy on the Spanish Lake townhome, employed Rufis to set a fire using an iron as a diversion, lived in a hotel for months after the fire, filed a claim, and collected payments after the fire. And shortly after that fire, Osuegbu developed a plan for another fire with Darrius and Rufis at the Clinton house, which migrated to the Washington house. Osuegbu paid for an insurance policy on the Clinton house, she showed up to the insurance company to sign documents for the policy, she urged Darrius to increase the policy limit, and she applied, but was denied, for a landlord's insurance policy. Osuegbu also gave advice as to the best time and place to set the fire and warned about cameras. When the plan transitioned towards the Washington house, Osuegbu crafted and delivered a fake lease for Rufis to sign.

Naturally, all the referenced evidence also folds into the remaining two charges against Osuegbu for conspiracy to commit arson and use of fire to commit a federal felony. Similar to Count 1 for conspiracy to commit mail and wire fraud, Count 14 required the jury to find that a conspiracy existed to maliciously damage and destroy by fire buildings involved in interstate commerce, namely the Patterson house, the Spanish Lake townhome, or the Clinton house rental properties, and that Osuegbu knowingly became a member of that conspiracy with an intent to advance it. *See* 18 U.S.C. § 844(i). And, to be convicted of use of a fire to commit a federal felony under 18 U.S.C. § 844(h) (Count 15), Osuegbu must have knowingly used fire to commit a federal felony, namely wire fraud, and "initiate[d] a fire as part of a scheme to deceive an insurance company into making payments for claimed losses." *United States v. Zendeli*, 180 F.3d 879, 885 (7th

Cir. 1999). Use of a fire to commit a felony requires proof of a nexus between the use of fire and the felony. *United States v. Pao Xiong*, 595 F.3d 697, 699 (7th Cir. 2010).

Without repeating the evidence outlined above, while it is undisputed that Rufis set the fires, the Government presented evidence that Osuegbu helped plan and capitalized on the fires to collect insurance payments. Evidence introduced at trial connects the wire fraud to the scheme to deceive the insurance companies into making payments for claimed losses. Moreover, Rufis and Darius testified as to Osuegbu's involvement and agreement to set up the insurance policies, stage the houses with furniture, submit insurance claims, and collect insurance money after the fires.

The record is certainly not devoid of evidence from which the jury could find guilt beyond a reasonable doubt. As thoroughly recounted above, the Government presented ample evidence, especially when weighed in its favor, for the jury to convict Osuegbu on each of the charges against her. Accordingly, Osuegbu's motion for judgment of acquittal is denied.

## II. Motion for New Trial (Doc. 172)

As an alternative to the motion for judgment of acquittal, Osuegbu also moves to vacate the jury's verdict and asks the Court to grant a new trial. (Doc. 172). Osuegbu argues that three reversible errors resulted in incurable prejudice warranting a new trial. (*Id.*).

First, Osuegbu mentions the Court's response and instruction provided after a written jury question during deliberations. (*Id.*). According to Osuegbu, the jury returned a verdict within 17 minutes of the Court's response, which demonstrates the overbroad

guidance provided to the jury. (*Id.*). Second, Osuegbu claims that the Court erred in failing to grant the defense's motion to strike the entire venire panel for lack of racial diversity and to declare a mistrial. (*Id.*). Lastly, Osuegbu claims she was prejudiced by a denial of her pretrial request for release as she never had the opportunity to present herself to the jury in the manner of her choosing. (*Id.*).

In response, the Government maintains that Osuegbu's arguments lack legal and factual support. (Doc. 178). As to her first point, the Government argues that Osuegbu fails to identify the particular error committed by the Court related to the answer to the jury's question beyond labeling it "overbroad" and also fails to explain the injurious effect of such error. (*Id.*). Similarly, the Government contends that Osuegbu is not entitled to any particular jury composition and emphasizes that Osuegbu raises no challenge to the District's selection procedures. (*Id.*). Finally, the Government states that Osuegbu's argument related to physical presentation and attire lacks a legal basis, because she was permitted to wear civilian clothes with no indication that she was incarcerated. (*Id.*).

Osuegbu takes issue with the Court's response to two written questions by the jury, calling it reversible error, without explaining how. She merely calls the response "overbroad" and emphasizes the jury's quick resolution of deliberations after receiving the Court's response. The jury asked two questions—one about timing considerations for each specific count, for example the timing of intent, and one about whether wire or mail fraud requires the crossing of state lines. (Doc. 210, pp. 7-9). The Court presented the jury's questions to the parties on the record, allowed argument from both sides as to the appropriate response to the questions, and provided each party a copy of its proposed

responses. (*Id.* at pp. 7-18). Notably, the Court denied the Government's prior motion to send the speaking indictment back with the jury.

Ultimately, the Court decided to bring in limited information from the indictment to clarify the timing issue for the jury. (*Id.* at pp. 16-17). The Court informed the jury that the second superseding indictment charges Osuegbu with a scheme to defraud beginning in October 2014 continuing through June 2023 with specific dates related to each alleged mailing or wire communication. In addition, the Court instructed the jury to review the entire packet of instructions for further guidance and to consider all instructions given. (*Id.*). As to the second question, the Court responded by directing the jury to the previously given instructions related to mail and wire fraud. (*Id.* at p. 17). The Court reiterated that the jury must consider all the instructions given. (*Id.*).

District courts retain "broad discretion in deciding how to respond to a question propounded from the jury" and have "an obligation to dispel any confusion quickly and with concrete accuracy." *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). To determine the appropriateness of supplemental instructions, there are a few considerations: whether the instruction as a whole fairly and adequately treated the issue, whether the supplemental instruction was a correct statement of law, and whether the district court answer the jury's question specifically. *Id.*

The Court does not see any reason that its instructions misled or misguided the jury. Indeed, the Court attempted to quickly dispel confusion with accuracy and reliance on the already provided and agreed to instructions. The Court simply quoted limited information from the indictment to clarify the timeline of the scheme charged. As to the

question regarding interstate communication, the Court did not provide new instructions but encouraged the jury to review the previously given instructions specific to mail and wire fraud to find an answer. These responses were appropriate given the circumstances and the questions.

Next, the Court agrees with the Government that Osuegbu is not entitled to any particular jury composition. "While the right to a jury trial guarantees the criminal defendant a fair trial by a panel of impartial, indifferent jurors, there is no requirement that a venire or jury mirror the general population." *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001) (internal citation and quotation marks omitted). "Defendants are not entitled to a jury of any particular composition." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). Thus, in and of itself, the makeup of any given venire is not significant, provided all rules for selection are properly observed. *Phillips,* 239 F.3d at 842.

Here, Osuegbu makes no argument that the rules for selection were not followed. Moreover, the Court addressed the issue of jury composition during trial and explained that the venire panel for Osuegbu's trial was actually representative of the pool of qualified voters in the District. (Doc. 203, pp. 273-275).

Finally, the Government states that Osuegbu's argument related to physical presentation and attire lacks a legal basis. (*Id.*). The Court agrees. First, Osuegbu was originally placed on bond but violated bond conditions and proved difficult to supervise. Thus, her bond was revoked, and she was detained pending trial. Osuegbu desired release pending trial to present herself in the manner of her choosing before the jury. A defendant's right to a fair trial incorporates her right to wear clothes other than jail attire.

*Estelle v. Williams,* 425 U.S. 501, 504-05 (1976). But that right is only violated if the defendant is forced to appear in jail attire during trial. *James v. Sternes*, 50 F. App'x 311, 312-13 (7th Cir. 2002). Of course, the Court permitted Osuegbu to wear clothes other than jail attire. While Osuegbu desired to personally shop for her clothes, style her hair differently, and otherwise present herself to the jury in the manner of her choosing, this does not present a basis for a new trial. She presented to trial each day with professional and appropriate clothing and grooming with no visible indication of her incarceration.

For these reasons, the Court finds no basis to order a new trial, and Osuegbu's motion for new trial is denied.

### III. Motion for Release from Custody Pending Sentencing (Doc. 195)

Osuegbu also moves for release pending sentencing. (Doc. 195). She argues that she needs an opportunity to organize her affairs before a potentially long term of imprisonment. (*Id.*). Osuegbu acknowledges that she was convicted for violation of 18 U.S.C. § 844(i), which is an offense listed in § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed.[23] (*Id.*). She also notes that the Government is not recommending that no sentence of imprisonment be imposed. (*Id.*). Thus, she can only be released if the Court finds a substantial likelihood that a motion for acquittal or new trial will be granted. (*Id.*). Osuegbu also contends that she poses no flight risk or danger to the community. (*Id.*).

The analysis is simple under 18 U.S.C. § 3143. As the Court denied both post-trial

---

[23] *See* 18 U.S.C. § 3143 referencing subparagraph (A), (B), or (C) of subsection (f)(1) of § 3142.

motions and the Government is *not* recommending that no sentence of imprisonment be imposed, the Court will not release Osuegbu pending sentencing. As such, her motion for release from custody pending sentencing is denied.

CONCLUSION

For these reasons, the Court **DENIES** Defendant Evette Betty Osuegbu's Motion for Judgment of Acquittal (Doc. 171), Motion for New Trial (Doc. 172), and Motion for Release from Custody Pending Sentencing (Doc. 195).

**IT IS SO ORDERED.**

**DATED:  June 30, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**